943 F.2d 49
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
LAMONT TELEVISION SYSTEMS, INCORPORATED, Plaintiff-Appellee,
v.
GATES HUDSON & ASSOCIATES, INC., Circle Associates
Partnership, Defendants-Appellants.
LAMONT TELEVISION SYSTEMS, INCORPORATED, Plaintiff-Appellee,
v.
GATES HUDSON & ASSOCIATES, INC., Defendant-Appellant,
and
Circle Associates Partnership, Defendant.
 Nos. 91-1414, 91-1436.
 United States Court of Appeals, Fourth Circuit.
 Argued July 8, 1991.
Decided Sept. 6, 1991.
 
 Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria. Albert V. Bryan, Jr., Chief District Judge. (CA-90-844-A)
 Wayne Gormly Travell, Tucker, Flyer & Lewis, P.C., Washington, D.C., for appellants.
 F. Andrew Carroll, III, Land, Clark, Carroll & Mendelson, P.C., Alexandria, Va., for appellee.
 E.D.Va.
 AFFIRMED.
 Before ERVIN, Chief Judge, and PHILLIPS and MURNAGHAN, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 This is an appeal by the owners and managers of an apartment complex from a judgment finding them in material breach for not cooperating with a provider of cable and broadcast television service, which wanted to make upgrades to an existing cable system. Appellants also challenge the award of liquidated damages. Finding no error, we affirm.
 
 
 2
 * Lamont Television System (LTS), plaintiff below, provided cable and broadcast television service pursuant to a contract to an apartment complex owned by appellant Circle Apartment Partnership (CAP) and managed by appellant Gates, Hudson & Associates (GHA). Broadcast and cable television service were first provided by LTS's predecessor through a satellite master antenna television system (SMATV), in which all units are wired to a common antenna and satellite dish on the roof. In 1985, LTS took over the contract and assumed ownership, maintenance and operation of the existing SMATV system. Sometime in early 1988, CAP purchased Circle Towers and became a successor to the previous owner's contract with LTS. Shortly thereafter, CAP employed GHA as its managing agent.
 
 
 3
 During the time that LTS operated and managed the SMATV system, tenants complained regularly of service problems. Both sides agree that most of the problems stemmed from the wiring configuration used in the system, which was serially wired on a vertical basis, so that a problem in the top floor apartment would necessarily impair the service of all those units below it which were on the same series. LTS made attempts to solve the problems, though there is dispute about how hard they tried and how successful they were. As a result of continued problems, GHA claimed that LTS was in default of the contract because the cable and broadcast service was unreliable and not state-of-the-art. LTS responded that it wanted the opportunity to upgrade the system in order to fix the problems, a right that it claimed was given it by the contract. To cure the problems, LTS presented GHA with two options. GHA did not like the two options because it claimed that one option shifted the management of the system from LTS to GHA, while the other option necessitated drilling holes in its recently completed renovations. LTS and GHA went back and forth on these claims of defaults and demand for upgrade for some time. Eventually, GHA terminated the contract, claiming LTS was in default by failing to provide adequate service. A short time later, LTS sent its own termination notice, contending GHA was failing to provide an opportunity to upgrade the system to solve many of the service problems.
 
 
 4
 LTS then filed this breach of contract action, seeking liquidated damages and attorneys' fees. After a one-day bench trial, the district court entered a judgment for LTS of $364,670 in liquidated damages. That award included the liquidated damages provided for in the contract: $92,000 for the equipment installed and not removable, and $2,420 per month in profit times 114 months remaining in the contract, or $275,880. Pursuant to the contract, the court also awarded attorneys' fees of $21,972.
 
 
 5
 After judgment was entered and a notice of appeal filed, GHA discovered that they were not in fact an owner of the apartment complex, as they had stipulated before trial, but were merely CAP's managing agent. GHA then filed a motion for relief from the judgment on the grounds that they had erroneously admitted that they were an owner, and that not being an owner would have given them a defense to LTS's claim. The court rejected this motion. This appeal followed.
 
 II
 
 6
 Appellants first contend that the district court erred in finding that a) appellants were in material breach, and b) appellee was not in breach. We consider these contentions in turn.
 
 
 7
 * The district court found that under the terms of the contract appellants had a duty to allow LTS to install the upgraded system, and that they acted unreasonably in failing to permit LTS to construct the new system. Appellants contend that the upgraded system was outside the scope of the SMATV agreement since it was a new and independent cable system and demanded much assistance by GHA personnel. In addition, appellants maintain that they acted reasonably because they were legitimately concerned with allowing an unreliable cable service provider to undertake construction in a newly renovated apartment complex.
 
 
 8
 Despite these claims, the district court found that under the contract appellants were required to assist LTS in gaining access to the apartment complex in order to make necessary repairs or upgrades of the system. The court found this obligation rooted in the SMATV agreement entered into by appellants' predecessor in interest and LTS, an agreement which the court found "granted authority to LTS to operate, maintain, repair, rebuild and upgrade the system...." The court further found as fact that the repair options presented by LTS "would cure the deficiencies in the system." Because LTS had a contractual duty to repair and upgrade the system, and because the course of repairs outlined by LTS would have repaired and upgraded the system successfully, the court found appellants in default for not assisting LTS in making such repairs.
 
 
 9
 We agree that the contract imposed on appellants a duty to cooperate and assist LTS in repairing and upgrading the state-of-the-art system that LTS was obligated to provide. Moreover, we find ample support for the finding that the proposed wiring system, though it would require minor construction in the newly renovated building, also would cure most of the problems in the existing system. Thus, we view the LTS proposal as one for a systemic upgrade, and under the contract appellants had a duty to assist LTS in making such upgrades. Certainly, appellants were not obligated to enter the cable business, and therefore the assistance and cooperation called for had to be reasonable. Here we find that LTS's upgrade proposal was contemplated in the contract under the "repair and upgrade" provision, and that it made reasonable demands on appellants.
 
 
 10
 Appellants further contend that they may have been in technical breach of the agreement, but the breach was not so serious as to warrant termination. The district court rejected this contention, with good reason. The service provided through the existing SMATV system was not performing well and required constant repair. LTS had an obligation to provide quality service. The court found that in realistic terms, the only way to accomplish that goal was to change the system. Consequently, we agree with the district court that it was more than a technical breach to interfere with LTS's ability to upgrade the cable service delivery system.
 
 B
 
 11
 Appellants contend that though they might have breached the agreement, LTS cannot maintain an action against them because it too was in default under the SMATV agreement. We agree with appellants that under Virginia law, as generally, a party who is in default cannot sue for breach or seek to enforce a contract. See Hurley v. Bennett, 176 S.E. 171 (Va.1934). Appellants contend that LTS was in default because in May 1988 through at least the date of termination, LTS was on notice from appellants that substantial outages occurred in the system and that the failure to fix these problems and maintain the system constituted a default pursuant to the SMATV agreement.
 
 
 12
 The district court found no material breach by LTS. In making findings from the bench, the district court stated:
 
 
 13
 Sure, there had been some complaints. Sure, there had been on occasion an unreasonable response time. They were not material breaches. The complaints would, as I say, have been resolved at least 90 to 95 percent of them, by the acceptance of this Option A.
 
 
 14
 We agree with the court below that LTS was not in material breach, or that if it was in breach that it was engaged in good efforts to cure, as permitted by the contract, but its efforts were thwarted by the lack of cooperation of appellants. Accordingly, we affirm the court's determination that appellants were in breach and LTS was not.
 
 III
 
 15
 Appellants contend that the district court erred in interpreting the contract by awarding full and undiscounted liquidated damages for equipment and for lost profits, arguing that the liquidated damages provision amounts to a penalty. Instead, appellants suggest that the court should have considered the depreciation of the equipment in setting the damages, the costs savings realized by LTS due to termination of the contract, and the time value of money in awarding the future profits. All of appellants' contentions are without merit.
 
 
 16
 * Paragraph 12.1 of the master agreement between LTS and CAP/GHA establish the remedies of LTS in the event of default by appellants. It provides that appellants "shall pay to [LTS] within sixty (60) days the sums as set forth in Exhibit J as liquidated damages for the cost to Operator for the system and removal of [LTS's] equipment at the Premises ..., and for compensation to [LTS] for loss of future profits under the remaining term of this Agreement." Exhibit J provides:
 
 
 17
 In the event the liquidated damages provision ... become [sic] operable, and it being otherwise difficult or impossible to determine [LTS's] actual damages the [appellants] shall pay [LTS] $92,000.00 as liquidated damages for the cost of installation and removal of the Operator's equipment installed at the Property which is not removable. Further, as additional damages, the [appellants] shall pay to [LTS] $2,420.00 times the number of months remaining under this Agreement.... If [LTS] must bring suit to collect such damages ... [appellants] shall pay the cost of suit and reasonable attorney's fees....
 
 
 18
 The district court, relying on this provision, awarded $92,000 for equipment, plus $2,420 times 114 months remaining in the contract, or $275,880, for a total of $367,880. (The court made a slight downward adjustment to $364,670, and that is not challenged on appeal.)
 
 
 19
 As a threshold matter, appellants contend that LTS was not entitled to liquidated damages since it failed to prove that damages were unascertainable in advance. Under Virginia law liquidated damages provisions are unenforceable when damages are easily ascertained at the time of agreement or when the award is grossly in excess of actual damages. See 301 Dahlgren Ltd. Partnership v. Board of Supervisors, 396 S.E.2d 651 (Va.1990). In this case, however, both the equipment damages and the lost profit damages were unknowable at the time the contract was made. That is so, first, because at that time it was not known how much equipment would be added to the system. For instance, if LTS had added the proposed wiring system, its liquidated damages still would be $92,000. The district court found that the $92,000 was consistent with the appraised value of the equipment some years ago, and as such was not grossly in excess of actual damages. We agree.
 
 
 20
 As to the award for lost profits, we also find that the precise amount of lost profits was unascertainable, both at the time of making of the contract, which is the legally significant time, and at the time of the breach. That is so because it is wholly speculative how lucrative cable television service will be some years hence. Will rates go up? Subscribers go up? Will new technology render the existing system obsolete? These factors are unknown and unknowable to contracting parties, and consequently profits are not easily ascertainable by the parties. The court therefore did not err in concluding that $2,420 was a fair and reasonable estimate, did not serve as a penalty, but was a reasonable liquidated damages provision.
 
 
 21
 We next consider appellants' particular challenges to the district court's damage award. First, they contend that the court erred by not depreciating the $92,000 equipment damage award, since that sum reflects the 1983 cost of the equipment, and the equipment was in use for seven years. This contention misconstrues the point of liquidated damages: they are an estimate of actual damages, a substitute for calculating values and then depreciating the basis, and if reasonable they should be upheld. It would be confused and wrong-headed to depreciate a liquidated damages figure, since such a process plays a role only in calculating actual values and not estimates of values.
 
 
 22
 Second, appellants contend that the $2,420 figure could represent gross profits and not net profits, and that as such LTS would be compensated for expenses they did not incur. Appellants further contend that the district court erred by not mitigating the damages by the amount of money LTS avoided by not completing performance. Again, these arguments misconstrue the role of liquidated damages and ignores appellants' contract. The agreement expressly provides for $2,420 in "profit" times the number of months remaining in the contract. That was what the parties agreed to, and that should be enforced unless it visits a penalty on one party. The district court found no penalty, and this was not erroneous. Whether the amount is gross or net profit is irrelevant, since all that matters is that the parties agreed to the figure and it is not unreasonable.
 
 
 23
 Finally, appellants contend the court erred by not discounting the award for lost profits. The court awarded $2,420 for each month left in the contract, which was due to run for another nine years. Appellants contend, rightly, that giving LTS $2,420 today instead of $2,420 nine years from now is giving it more money, in current dollars, than it would have earned. That argument certainly makes economic sense, and if this case involved payments on a lease, like the case appellants rely on, see Heller Financial Inc. v. Burry, 633 F.Supp. 706, 707 (N.D.Ill.1986), we might view the matter differently. However, the figure used by the court comes from the parties' agreement. The 8 agreement makes no allowance for discounted value, and neither should a court, as long as the liquidated damages clause otherwise passes scrutiny. It does pass muster, and therefore it should be enforced and discounting of values is inappropriate.
 
 IV
 
 24
 Finally, appellants posit that the district court abused its discretion by denying GHA's motion for relief from judgment. GHA filed the motion on the grounds that it was in error when it stipulated that it was an owner of the apartment complex; in fact, GHA was merely an agent of CAP and was not and never has been an owner. According to GHA, this fact would have given it a defense to the action and caused its dismissal from the suit. GHA contends that the court abused its discretion in not granting relief from judgment because its co-defendant had posted a supersedeas bond, GHA was not a proper party to the action, and no undue prejudice would result to LTS from dismissal of GHA.
 
 
 25
 We recognize that courts have been and should be willing under appropriate circumstances to permit parties to withdraw stipulations. But because it has such obvious potential for unfairness to opposing parties, works against principles of finality and repose, and is an invitation to carelessness by parties and counsel, this is an act of grace to be exercised with great caution. The decision whether to allow withdrawal in a particular case is one particularly fit for the exercise of trial court discretion. We find no abuse in the district court's denial of the motion for leave to withdraw here.
 
 
 26
 AFFIRMED.